1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11   ALMA M. ALBERT,

12                              Plaintiff,

13   v.

14   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,

15
                               Defendant.
16

Case No.:  15cv1973 AJB(JMA)

**ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT [ECF NO. 12] AND
GRANTING DEFENDANT'S
CROSS-MOTION FOR
SUMMARY JUDGMENT [ECF
NO. 20]**

17

18        Plaintiff Alma M. Albert ("Plaintiff") seeks judicial review of Defendant

19   Social Security Acting Commissioner Carolyn W. Colvin's ("Defendant")

20   determination that she is not entitled to disability insurance and supplemental

21   security income ("SSI") benefits. The parties have filed cross-motions for

22   summary judgment. For the reasons set forth below, Plaintiff's motion for

23   summary judgment is **DENIED** and Defendant's cross-motion for summary

24   judgment is **GRANTED**.

25

26   **I.     BACKGROUND**

27        Plaintiff was born on June 16, 1953 and was age 58 when she filed her

28   applications for benefits. (Id. at 186.) She attended school in Mexico and

1
2
3

dropped out in or after tenth grade. (Id. at 54-55.) She has worked in the past as a cashier, gardener, janitor, phone answerer, home caregiver, and salesperson at Sears Roebuck. (Id. at 249-56.) She last worked in 2010. (Id. at 55-56.)

4
5
6
7
8
9
10
11
12
13
14

On December 2, 2011, Plaintiff filed applications for SSI and disability insurance benefits, alleging a disability onset date of October 26, 2011. (Admin. R. at 186-96; 197-200.)[1] Plaintiff's applications were denied initially on May 29, 2012, and again upon reconsideration on January 9, 2013. (Id. at 135-39, 141-45.) On February 12, 2013, Plaintiff requested an administrative hearing. (Id. at 147-48.) A hearing was conducted on November 22, 2013 by Administrative Law Judge ("ALJ") George W. Reyes, who determined Plaintiff was not disabled. (Id. at 20-31.) Plaintiff sought review of the ALJ decision, which the Appeals Council for the Social Security Administration ("SSA") denied, making the ALJ's decision the final decision of the Commissioner. (Id. at 1-6.) Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

15

16  **II.   MEDICAL RECORDS**

17  **A.   November-December 2011**

18
19
20
21
22
23
24
25

Dr. Louis Blumberg of Imperial County Behavioral Health performed an intake assessment of Plaintiff on November 18, 2011. (Id. at 474-77.) Plaintiff reported "feeling very sick" without Citalopram (also referred to as Celexa), an anti-depressant she had been taking since 2006. (Id. at 474.) She stated her mental problems began at age 7 when she was raped by a stranger. (Id.) She experienced problems with panic attacks, hyperarousal, anger, sleep, concentration, trust, guilt, flashbacks, avoidance behaviors, suicidal thoughts, and depression, but had never talked about the incident until twenty years after it

26
27
28

[1] Plaintiff's disability onset date was later amended to November 25, 2010. See Admin. R. at 20, 79, 90.

occurred. (Id.) She stated she had dropped out of school after tenth grade and was raped again at age 22 by a stranger, which caused further post-traumatic stress. (Id.) Plaintiff reported she had been hospitalized for two weeks after a suicide attempt at age 25, again at age 38 for one month, and a third time at age 40 for three days. (Id.) She complained of chronic worry, sleep disturbance, lack of appetite, poor concentration, irritability, lethargy, suicidal thoughts, inability to cry, social isolation, and occasional panic attacks. (Id.) She had begun hearing voices telling her "she's no good" a week before her visit. (Id.) She admitted to using marijuana daily. (Id. at 475.) Dr. Blumberg diagnosed prolonged post-traumatic stress disorder, generalized anxiety disorder, panic disorder, and major depressive disorder recurrent, severe with psychotic features. (Id. at 476.) His treatment plan included a medication support assessment and an expedited referral to therapy. (Id. at 477.)

Plaintiff presented to Dr. Peter Csapoczi of Clinicas de Salud del Pueblo, Inc., her primary care provider, on November 30, 2011. (Id. at 465-68.) She complained of anxiety and required a refill of Citalopram. (Id. at 465.) Plaintiff's list of chronic problems included bipolar disorder, unspecified, and depressive disorder, not elsewhere classified. (Id.)

Plaintiff saw Dr. Alfred French of Imperial County Behavioral Health Services on December 5, 2011. (Id. at 479-80.) Plaintiff stated, "[I]f something goes wrong, I flip," leading to "episodes" lasting multiple days. (Id. at 479.) She stated she felt anxious most of the time. (Id.) Upon examination, Dr. French reported Plaintiff was "intense, very controlling, moderately high intensity, and shift[ed] continually from one system to another." (Id.) In addition to Citalopram, which had worked best in the past for Plaintiff, Dr. French prescribed Keppra due to Plaintiff's history of depression with "episodic ego-dystonic agitation."

15cv1973 AJB(JMA)

(Id.)[2] Dr. French planned to see Plaintiff frequently due to the complexity of her disorder. (Id.)

**B.   January-July 2012**

On January 9, 2012, Dr. French reported an improvement in Plaintiff's irritability and anxiety, as well as Plaintiff's relationship with her boyfriend. (Id. at 478.) Dr. French described Plaintiff as alert, cooperative, and able to speak coherently. (Id.) There was no evidence of thought or mood disorder and Plaintiff reported she had "overall a good life with friends" and was "delighted with her three dogs [and] gardens." (Id.)

In February 2012, Dr. Mark Zink of Imperial County Behavioral Health Services took over Plaintiff's psychiatric care. She reported "feeling bad" and stated she had cut her dosage of Celexa in half, to 10mg, because it was easier on her stomach. (Id. at 499.) Dr. Zink increased Plaintiff's dosage of Celexa back to 20mg and recommended she continue taking Keppra. (Id.) Plaintiff reported improvement the following month, even though she had discontinued Keppra on her own because of negative side effects. (Id. at 496.) Overall, she felt "much better" than she had been, and had improved sleep and appetite. (Id.) Dr. Zink noted Plaintiff appeared to be benefitting from therapy. (Id.)  Despite this, Plaintiff had discontinued going to therapy by the following month, even though it was helping her, because she had "too many appointments." (Id. at 495.) Plaintiff saw Dr. Csapoczi, her primary care doctor, in March and April 2012, at which time she reported abdominal pains, pelvic pains, not feeling well, poor appetite, and urinary incontinence. (Id. at 526-29, 534-46.)

At the request of the Department of Social Services, Dr. Ernest Bagner of

---

[2] Keppra is an anti-seizure medication which is used off-label as an adjunctive treatment for anxiety disorders. See MedMerits, http://www.medmerits.com/index.php/article/levetiracetam/P3 (last visited Aug. 26, 2016).

S&L Medical Group performed a Complete Psychiatric Evaluation of Plaintiff on April 21, 2012. (Id. at 487-91.) Dr. Bagner assessed Plaintiff's mood as "depressed and anxious," and her affect as "blunted." (Id. at 489.) Although Plaintiff stated she was experiencing auditory hallucinations, Dr. Bagner did not report her to have any delusions. (Id.) Dr. Bagner listed Plaintiff's diagnoses as bipolar disorder, post-traumatic stress disorder, cannabis dependence, and alcohol dependence, full remission, and determined her Global Assessment of Functioning ("GAF") score to be 60. (Id. at 490.)[3] Dr. Bagner assessed Plaintiff as mildly limited in following simple oral and written instructions; moderately limited in following detailed instructions, interacting with the public, coworkers, and supervisor, complying with job rules, responding to changes in a routine work setting, and in her daily activities; and severely limited in responding to work pressure in a usual work setting.  (Id. at 490-91.) Dr. Bagner concluded that Plaintiff's prognosis was guarded from a psychiatric standpoint. (Id. at 491.)

On May 9, 2012, Plaintiff reported to Dr. Zink she had started taking Keppra again as she believed it helped her irritability and sensitivity more than Celexa. (Id. at 493.) Dr. Zink increased Plaintiff's dosage of Keppra to 250mg and decreased Celexa to 10mg per day. (Id.) In July 2012, Plaintiff was "feeling a bit better with the medications," but was still facing numerous personal difficulties. (Id. at 593.) Plaintiff described having issues with her boyfriend, her

------

[3] The GAF scale is a numeric scale (0 through 100) used by mental health practitioners to rate social, occupational, and psychological functioning, with lower numbers representing more severe symptoms, difficulties, or impairments. The scale is presented in the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision ("DSM-IV-TR"). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, DSM-IV-TR (2000). The GAF is no longer included in the 5th Edition of the DSM. See Journal of the American Academy of Psychiatry and the Law Online, http://www.jaapl.org/content/42/2/173.full (last visited Aug. 26, 2016).

15cv1973 AJB(JMA)

chihuahua puppy had died, and she was afraid to walk alone in her neighborhood "for fear of retribution from [an] ex-neighbor." (Id.) Plaintiff requested to continue on the same the medication regimen. (Id.)

Dr. Heather Barrons, Psy.D, a non-examining physician, prepared a report dated May 23, 2012 regarding her examination of Plaintiff's records. (Id. at 82-89, 93-100.) Dr. Barrons noted that Plaintiff had begun mental health treatment in November 2011 and by January 2012, had shown improvement with treatment, including "improved social relationships and good life with friends." (Id. at 85.) She found Plaintiff had a good prognosis so long as she remained compliant with treatment. (Id.) Dr. Barrons considered Listings 12.05 (affective disorders), 12.09 (substance addiction disorders), and 12.06 (anxiety disorders) of the Listing of Impairments, but found the medical evidence did not establish the presence of the "C" criteria of these listings. (Id.)[4] Dr. Barrons determined, *inter alia*, that Plaintiff was capable of understanding and remembering simple instructions and procedures as well as work place locations; capable of maintaining concentration, pace and persistence for simple routines throughout a normal workday and workweek; able to interact with co-workers and supervisors; capable of public contact; and able to adapt to a work environment. (Id. at 88.) Dr. Barrons believed Plaintiff's condition was expected to improve and would not result in significant limitations in her ability to work. (Id. at 89.) Dr.

---

[4] The Listing of Impairments sets forth certain impairments which are considered to be of sufficient severity to prevent the performance of any gainful activity. See 20 C.F.R. § 404.1525(a). To meet a Listing, the evidence of record must be sufficient to establish the existence of every medical and other finding specified for that Listing. See 20 C.F.R. § 404.1525(d); Key v. Heckler, 754 F.2d 1545, 1549-50 (9th Cir. 1985). The paragraph C criteria of the mental disorder listings describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 A.

15cv1973 AJB(JMA)

Barrons concluded Plaintiff's condition was not so severe as to prevent work for twelve months in a row and therefore, Plaintiff was not disabled. (Id.)

In July 2012, Dr. Zink completed an impairment questionnaire in which he indicated Plaintiff had marked limitations in her abilities to sustain work activities in a competitive work environment. (Id. at 548-54.) He assessed Plaintiff as being incapable of tolerating even low work stress as she was fragile, pessimistic, easily overwhelmed, easily irritated, and lacked persistence. (Id. at 554.)

## C.  September-December 2012

In September 2012, Plaintiff called the registered nurse at Imperial County Behavioral Health Services, stating, "My neighbor told me you guys were over here and that you told him all my business and everything about me." (Id. at 590.) Plaintiff had visited the emergency room, where she was given Xanax. (Id.) Plaintiff reported feeling "depressed, discouraged, desperate," and claimed her neighbor was "shouting at her through the walls during the middle of the night." (Id.) She told Dr. Zink, "I just want somebody to help me, please," and stated she was in a hostile dependent situation with her boyfriend "until I get my SSI." (Id.) Dr. Zink reported Plaintiff to have "poor insight into her apparently paranoid/psychotic condition," and a "depressed, discouraged, fearful, and despondent" mood. (Id.) He assessed Plaintiff as having "presumed auditory hallucinations" and prescribed her Seroquel-XR, used to treat schizophrenia, bipolar disorder, and major depressive disorder. (Id.)

Plaintiff was much improved a week later. (Id. at 588.) However, while Plaintiff reported improved sleep and appetite, Dr. Zink still assessed her as psychotic and paranoid in regard to her neighbor. (Id.) A couple of weeks later, in October 2012, Plaintiff reported that she was feeling "a lot better" and was sleeping "real good" with her medicine regimen. (Id. at 587.) Plaintiff expressed more interest in gardening, painting, and sewing. (Id.) Dr. Zink instructed Plaintiff

7

to continue with her medications, including Keppra, Citalopram, and Zyprexa, which she had been taking in lieu of Seroquel. (Id.) Plaintiff continued to report improvement on November 7, 2012, at which time she reported "feeling really good" and stated the medicine was helping a lot. (Id. at 586.) Her sleeping had improved, she was less depressed, and Dr. Zink noted she had fewer paranoid and psychotic symptoms. (Id.) Her troublesome neighbor had moved out, and Plaintiff was taking care of her dogs and exercising. (Id.) Dr. Zink noted he might reduce Plaintiff's dosage of Zyprexa on Plaintiff's next visit. (Id.)

On November 14, 2012, Dr. Zink wrote a "To Whom It May Concern" letter regarding Plaintiff's condition. (Id. at 577.) He reported that it had become apparent during the course of treatment that "the disabling impairments suffered by [Plaintiff] are much more severe than previously considered." (Id.) He indicated Plaintiff's diagnoses were bipolar disorder and psychosis. (Id.) While Dr. Zink noted Plaintiff's "symptoms have responded significantly to medications," he opined that Plaintiff remained completely disabled from working. (Id.)

In December 2012, Plaintiff reported continued improvement with her medication. (Id. at 584.) Plaintiff stated, "I don't get upset about things like I did, like when my boyfriend says hurtful things." (Id.) Dr. Zink kept Plaintiff on the same medication dosages, but again noted that Plaintiff's dosage of Zyprexa might be reduced on her next visit. (Id.)

**D.  January-March 2013**

Dr. Daniel Funkenstein, a non-examining physician, prepared a report on January 4, 2013 regarding his examination of Plaintiff's records. (Id. at 107-16, 121-30.) Dr. Funkenstein assessed Plaintiff as not disabled. (Id. at 114.) While Dr. Funkenstein did not believe Plaintiff could perform her past job as a salesperson, he assessed Plaintiff as capable of other work. (Id. at 114-15.)

Dr. Morteza Rahmani of Imperial County Behavioral Health Services took

over Plaintiff's psychiatric care from Dr. Zink in January 2013. (Id. at 665.) Between January and August 2013, Plaintiff reported feeling good, but did not feel comfortable around people because of what had happened with her neighbor, who had harassed her. (Id. at 662-66.) At times, she still heard the voice of her neighbor. (Id. at 664.) Plaintiff stated she spent her time doing house chores, did not interact with others, and mostly stayed at home. (Id. at 663.) In June 2013, she was worried about her physical health as she had recently visited the emergency room for a stomach problem, had lost a couple of pounds, and was scheduled to see a GI specialist. (Id. at 662.)[5] Throughout this period, Plaintiff's diagnosis was listed as "bipolar disorder most recent episode depressed, severe with psychotic features." (Id. at 662-66.) Plaintiff continued taking her medications regularly, including Keppra, Citalopram, and Zyprexa. (Id.)

In March 2013, Dr. Csapoczi, Plaintiff's primary care doctor, completed a questionnaire reflecting his opinion that Plaintiff could sit for 6 hours in an 8-hour workday, stand or walk for 4 of 8 hours, would likely experience an increase in symptoms if placed in a competitive work environment, could tolerate moderate stress, and could work a full time competitive job that required activity on a sustained basis, but would have psychological limitations. (Id. at 609-16.)

## III.   THE ADMINISTRATIVE HEARING

The ALJ conducted an administrative hearing on November 22, 2013. (Id. at 20, 39.)

//

---

[5] A CT scan performed in July 2013 showed colonic diverticulosis without acute diverticulitis. (Admin. R. at 667-68.)  In August 2013, Plaintiff was seen by Dr. Theodore Affue, M.D. for evaluation of a kidney lump or mass. (Id. at 688-90.)

**A.    Plaintiff's Testimony**

Plaintiff testified she became disabled on November 25, 2010. (Id. at 42.) Although she had not worked since that date, she had looked for work and had received unemployment benefits from the State of California from 2010 until the third quarter of 2012, which had required her to state that she was capable of working during that period. (Id. at 42-43.) She testified she was unable to work because of mental problems as well as physical problems, including stomach issues, a lump in her kidney, and a weak bladder. (Id. at 43-44, 46.)

Plaintiff testified she could walk two blocks in five minutes before needing to rest for approximately three minutes. (Id. at 47-48.) She stated she could stand for an hour, sit for fifteen minutes, and lift and carry sixty pounds in each arm. (Id. at 48-49.) Plaintiff initially testified that she had used marijuana on a daily basis for only the previous six months before the hearing, but then amended her testimony after the ALJ quoted from a treatment note from April 2012 which indicated she was then using marijuana on a daily basis. (Id. at 52-54.) She used marijuana because it helped her relax and helped her depression. (Id. at 52.) She testified she had attended school in Mexico through ninth grade, and had not finished tenth grade notwithstanding a previous statement in her medical records indicating that she had. (Id. at 54-55.) When asked if she could perform the work of a salesperson, as she had for Sears Roebuck in 2003 and 2004, she testified, "Probably I could, yes. Yes." (Id. at 56-57.)

Plaintiff stated her "mental problems" included a fear of people, fear of walking alone, hearing voices in her head, and depression. (Id. at 58-59.) She felt depressed three times per week, at which time she wanted to cry, did not want to eat, did not want to get cleaned up, and did not want to go anywhere or do anything. (Id. at 59.) This feeling would last a day or two until her medication assisted her. (Id.) Plaintiff had been in a relationship with her boyfriend for six years, but they did not do anything for fun because she refused to go anywhere.

(Id. at 60.) She experienced flashbacks of being raped as a 7-year-old approximately every two weeks. (Id. at 61-62.) She did not have difficulty being in public places such as the grocery store or bank, but did not feel comfortable if she walked in the streets. (Id. at 63.) She did not like to be around people and did not smile often. (Id. at 68-69.) Being around her two dogs made her happy. (Id. at 69.)

Plaintiff stated even though she had testified she could do the work of a salesperson, she had lost her previous salesperson job because of her depression. (Id. at 63.) Specifically, she had had an argument with the manager and quit. (Id.) She had previously worked out at a gym, but had stopped because she had "been so sick." (Id. at 66.) She testified she had problems remembering dates and places. (Id. at 66-67.)

## B. **Vocational Expert's Testimony**

Vocational expert ("VE"), Mary E. Jesko, testified at the administrative hearing. (Id. at 70.) The ALJ presented a hypothetical question involving a claimant who could perform medium work, could not use ladders, ropes, or scaffolds, who was limited to simple, routine tasks, and could not perform such tasks in a fast-paced production environment. (Id. at 71.) The hypothetical claimant was also limited to only occasional interaction with supervisors and coworkers, and to brief, intermittent, and superficial public contact. (Id.) Additionally, the hypothetical claimant could concentrate for two-hour periods of time throughout a typical eight-hour workday, must have brief access to a bathroom every 2 to 2½ hours, and must be able to use incontinent protection. (Id. at 72.) The hypothetical claimant was sixty years old, had a tenth grade education in Mexico, and was able to speak fluent English. (Id. at 72.)

The VE testified the hypothetical claimant would be unable to work as a salesperson. (Id. at 72.) Such a hypothetical claimant could, however, work as a sweeper cleaner, a floor waxer, or as a laundry worker. (Id. at 73.) The VE

15cv1973 AJB(JMA)

stated that in these occupations, a person could be off task for six minutes per hour and absent three times per month and still sustain employment. (Id. at 73-74.) The VE testified further the hypothetical claimant could not perform the three jobs she had identified without being able to stand for six hours in an eight-hour workday. (Id. at 74-75.)

## IV.   THE ALJ DECISION

After considering the record, the ALJ made the following findings:

. . . .

2. The claimant has not engaged in substantial gainful activity since November 25, 2010, the alleged onset date [citations omitted].

3. The claimant has the following severe impairments: bipolar disorder, post-traumatic stress disorder (PTSD), anxiety disorder and depressive disorder [citations omitted].

. . . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in [the Social Security Regulations].

. . . .

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant cannot use ladders, ropes, or scaffolds. She is further limited to simple routine tasks, and cannot perform such tasks in a fast-paced production environment. She is limited to only occasional interactions with supervisors and co-workers and further limited to only brief, intermittent and superficial public contact. She can attend and concentrate for two-hour blocks of time throughout an 8-hour workday with the 2 customary 10 to 15 minute breaks and the customary 30 to 60 minute lunch period. The claimant should also be allowed to work in a job that allows brief access to a bathroom every 2 to 2 ½ hours throughout the workday. She is limited to jobs that allow her to use incontinent protection.

. . . .

15cv1973 AJB(JMA)

6.   The claimant is unable to perform any past relevant work [citations omitted].

. . . .

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform [citations omitted].

. . . .

11.  The claimant has not been under a disability, as defined by the Social Security Act, from November 25, 2010, through the date of this decision [citations omitted].

(Admin. R. at 22-31.)

## V.   STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. See 42 U.S.C. § 423(d)(1)(A), (2)(A). An applicant must meet both requirements to be "disabled." Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.   Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled." The five steps are: (1) Whether the claimant is presently working in any substantial gainful activity. If so, the claimant is not

disabled. If not, the evaluation proceeds to step two. (2) Whether the claimant's impairment is severe. If not, the claimant is not disabled. If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments. If so, the claimant is disabled. If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past. If so, the claimant is not disabled. If not, the evaluation continues to step five. (5) Whether the claimant is able to do any other work. If not, the claimant is disabled. Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled. 20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.   Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Commissioner's final decision should not be disturbed unless the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000); Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing

*Andrews*, 53 F.3d at 1039). Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed. *Vasquez*, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The matter may also be remanded to the SSA for further proceedings. Id.

## VI.    DISCUSSION

Plaintiff argues the ALJ erred in granting little or no weight to the mental function opinions of Dr. Zink, treating psychiatrist, and Dr. Bagner, examining psychiatrist. (Pl.'s Mot. at 13-20.)

"In disability benefits cases . . . physicians may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability–the claimant's ability to perform work." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). There are three types of physicians in such cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). As a general matter, opinions of treating physicians are given controlling weight when supported by medically acceptable diagnostic techniques and when consistent with other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. Further, the opinion of a treating physician is entitled to greater weight than that of an examining physician, and the opinion of an examining physician is entitled to greater weight than that of a non-examining physician. *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "The weight afforded a non-examining physician's testimony depends on the degree to which he provides supporting explanations for his opinions." Id. (citing § 404.1527(d)(3)).

If a physician's opinion in the record is contradicted by another doctor's opinion, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence" in order to reject the opinion. Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). "An ALJ can satisfy the 'substantial evidence' requirement by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Garrison, 759 F.3d at 1012 (quotations and citation omitted). Opinions of nonexamining medical advisors may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (citing Andrews, 53 F.3d at 1041).

In the case at hand, the medical opinions of Dr. Zink and Dr. Bagner were contradicted by substantial evidence in the record. Their opinions were contradicted by non-examining psychiatrists, Dr. Barrons and Dr. Funkenstein, both of whom determined Plaintiff was not disabled and whose opinions were consistent with the medical notes of Dr. Rahmani, who saw Plaintiff from January to August 2013 and reported continual improvement. In April 2013, Dr. Rahmani assessed Plaintiff to be "stable on her meds" and did not detect any manic or psychotic symptoms, mood swings, or suicidal or homicidal ideation. (Id. at 663.) By September 2013, Plaintiff did not did not have any problems with sleep, hallucinations, delusions, or mood swings. (Id. at 666.) Additionally, she rated her depression a three out of ten and claimed to have a good relationship with her boyfriend. (Id.) Thus, because Dr. Zink and Dr. Bagner's opinions were contradicted by medical evidence in the record, the ALJ must provide specific and legitimate reasons supported by substantial evidence in order to discount or reject their opinions. See, e.g., Bayliss, 427 F.3d at 1216.

**A.   Dr. Zink**

Plaintiff contends the ALJ's reasons for giving Dr. Zink's opinion only little

weight were legally insufficient and factually inaccurate. (Pl.'s Mot. at 14.) The ALJ articulated the following reasons for granting only little weight to Dr. Zink's opinion that Plaintiff was completely disabled from working: (1) Dr. Zink's opinion was inconsistent with the objective medical evidence of record which, in the ALJ's opinion, supported that Plaintiff would only have the marked limitations found by Dr. Zink "if working in a more skilled/stressful environment"; (2) Dr. Zink lacked a longitudinal history as he only saw Plaintiff between February and December 2012; (3) the records showed Plaintiff had a positive response to medications; and (4) notwithstanding Plaintiff's lack of credibility, Dr. Zink accepted "just about everything" Plaintiff said. (Admin. R. at 28.) The Court will address each of these reasons in turn.

### 1.  The ALJ Properly Found Dr. Zink's Opinion was Inconsistent with Objective Medical Evidence of Record

The ALJ found the objective medical evidence in the record indicated Plaintiff would only have "marked" functional limitations if she worked "in a more skilled/stressful environment," and accordingly determined Dr. Zink's opinion that Plaintiff was completely disabled from working was inconsistent with the record as a whole. (Id.) Plaintiff argues this was not a specific and legitimate reason to reject Dr. Zink's opinion as the ALJ failed to identify the information supporting his determination. (Pl.'s Mot. at 15.)

In providing specific and legitimate reasons to reject a treating physician's opinion, an ALJ should set out "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Garrison, 759 F.3d at 1012 (quotations and citation omitted). The ALJ did so here. First, the ALJ summarized and interpreted the medical opinions of Dr. French and Dr. Rahmani, two of Plaintiff's treating psychiatrists. The ALJ noted Dr. French described Plaintiff as "alert" and "cooperative," and reported she had "an overall good life with friends." (Admin R. at 26.) Additionally, Dr.

French reported Plaintiff spoke "in length and [in] well-organized paragraphs with a variety of themes, maintaining coherence." (Id.) The ALJ also discussed Dr. Rahmani's treatment notes. Dr. Rahmani, who assumed Plaintiff's psychiatric treatment immediately following Dr. Zink, reported Plaintiff to be stable on her medications. (Id.) In sessions with Dr. Rahmani, Plaintiff denied having any hallucinations, delusions, or mood swings, and rated her depression a three out of ten. (Id.) Dr. Rahmani assessed Plaintiff as being "oriented times three," as having fair hygiene, and exhibiting no agitation or retardation. (Id.) The ALJ regarded Dr. French and Dr. Rahmani's opinions as evidence that "[Plaintiff's] symptoms were essentially controlled by medications and exacerbations were due to noncompliance, unusual event triggers or medication adjustments as needed." (Id.)

Second, the ALJ analyzed Plaintiff's self-reported daily activities. Plaintiff reported she could care for her personal needs, care for her pet dogs, prepare simple meals, do household chores, shop for groceries and necessities, garden, watch television, and talk on the phone with friends. (Id.) The ALJ found these activities were indicative of Plaintiff maintaining "a somewhat normal level of daily activity and interaction." (Id. at 27.) The ALJ assessed "the physical and mental requirements of these household tasks and social interactions" and concluded they "are consistent with a significant degree of overall functioning." (Id.) Evidence establishing that a claimant can carry out daily activities may be used to discount a physician's opinion of disability. See, e.g., Morgan, 169 F.3d at 601-02.

The ALJ acknowledged and accounted for Plaintiff's functional limitations by limiting the type of work she could perform to simple routine tasks, not in a fast-paced production environment, with only occasional interactions with supervisors and co-workers, and only brief, intermittent, and superficial public contact. (Id. at 24.) As the ALJ thoroughly summarized the record, stated his

interpretation of the facts, and made findings (see Garrison, 759 F.3d at 1012), the ALJ's determination that Dr. Zink's opinion was inconsistent with the objective medical evidence in the record constitutes a specific and legitimate reason to discount his opinion regarding Plaintiff's functional abilities.

## 2.   The ALJ Properly Found that Dr. Zink Lacked Longitudinal History

The ALJ's second proffered reason for discounting Dr. Zink's opinion was that Dr. Zink lacked a longitudinal history as he only saw Plaintiff between February and December 2012. (Id. at 28.) Plaintiff argues this did not constitute an adequate reason to discount Dr. Zink's opinion, as Dr. Zink treated Plaintiff the most and over the longest period of time, and thus his opinion should have been given more weight. (Pl.'s Mot at 15-16.)

In analyzing and weighing treating physicians' medical opinions, an ALJ will consider several factors, including the length of a physician's treatment and the frequency of his or her examinations. Generally, an ALJ will give a physician's opinion more weight the longer he or she has treated the claimant and the more times the physician has seen the claimant. 20 C.F.R. § 404.1527(c)(2)(i). Additionally, the ALJ will give a medical source more weight when the source has seen a claimant "long enough to have obtained a longitudinal picture of [her] impairment." Id. Here, the ALJ's discounting of Dr. Zink's opinion due to a lack of longitudinal history constituted a specific and legitimate reason supported by substantial evidence in the record. The ALJ explained, "Dr. Zink lacks a longitudinal history and the records show the claimant has a positive response to medications. Dr. Zink only saw the claimant approximately ten times between February 22, 2012 and December 5, 2012." (Admin R. at 28.) While it is correct, as Plaintiff observes, that Dr. Zink treated Plaintiff the most and for the longest period of time, Dr. Zink stopped treating Plaintiff in December 2012. After December 2012, Plaintiff continued to experience a positive response to

medication and her condition further improved. (Id. at 26.) The ALJ noted Dr. Rahmani's reports from August 2013, which stated Plaintiff did not have any delusions, hallucinations, or mood swings. (Id.) Additionally, Plaintiff rated her depression a three out of ten and Dr. Rahmani stated she was "stable on her current medications." (Id.) Analyzing the medical evidence as a whole, the ALJ determined that through August 2013, Plaintiff's "symptoms were essentially controlled by medications." (Id.)

As Dr. Zink stopped treating Plaintiff in December 2012, and Plaintiff had continual improvement and success controlling her symptoms with medication after that point, the ALJ could properly find Dr. Zink did not have a longitudinal picture of Plaintiff's condition and level of impairment.

### 3.    The ALJ Properly Discounted Dr. Zink's Opinion Based on Plaintiff's Positive Response to Medications

The ALJ discounted Dr. Zink's opinion regarding Plaintiff's level of impairment, as Plaintiff's medical records showed she had a positive response to medications. (Id. at 28.) Plaintiff argues the ALJ erred in doing so, as she asserts that any improvements she experienced were either short-lived or incomplete. (Pl.'s Mot. at 16.) Plaintiff further argues that even allowing that her condition periodically improved with medication, the ALJ erroneously presumed the improvements were so dramatic in scope and duration that her impairments would no longer significantly impact her ability to function in a workplace. (Id. at 17.)

When considering the effect of medication on a claimant's well-being, it is error for an ALJ to deny a claimant is disabled merely because she has shown improvement or experienced cycles of improvement. Garrison, 759 F.3d at 1017. An ALJ must interpret improvement in mental health issues "with an understanding of the patient's overall well-being" and "with an awareness that improved functioning while being treated and while limiting environmental

stressors does not always mean that a claimant can function effectively in a workplace." Id. In analyzing an individual's overall well-being, the ALJ may consider Plaintiff's daily activities, treating therapist notes, and evidence suggesting she has responded well to treatment. Crane v. Shalala, 76 F.3d 251, 254 (9th Cir. 1996). If an ALJ finds an impairment can be controlled with treatment or medication, the impairment cannot be considered disabling. Warre v. Comm'r of Soc. Sec., 439 F.3d 1001, 1006 (9th Cir. 2006).

The ALJ reviewed the record and determined Plaintiff's symptoms were effectively controlled by medication. (Admin R. at 26.) First, the ALJ discussed Plaintiff's earlier improvements with treating psychiatrist, Dr. French. (Id.) Dr. French reported Plaintiff responded positively to medications and that, after prescribing Keppra, she experienced a "reduction in the target symptoms of irritability and anger." (Id.) The ALJ next analyzed the medical records of Plaintiff's later treating psychiatrists, Dr. Rahmani and, indeed, Dr. Zink, which continued to show Plaintiff's symptoms were "essentially controlled by medications and exacerbations were due to noncompliance, unusual event triggers or medication adjustments as needed." (Id.) In August 2013, Dr. Rahmani noted Plaintiff was taking her medications regularly, was aware she would feel depressed or irritable without her medications, and, most importantly, was stable on her medications. (Id.) The ALJ also analyzed Plaintiff's daily activities. (Id. at 26-27.) Plaintiff reported doing daily activities such as caring for her personal needs, caring for her two pet dogs, doing household chores, shopping for groceries, and talking on the phone with friends. (Id. at 26.) The ALJ determined Plaintiff "has maintained a somewhat normal level of daily activity and interaction" and the "household tasks and social interactions are consistent with a significant degree of overall functioning." (Id. at 27.)

The Court finds the ALJ's discounting of Dr. Zink's opinion due to Plaintiff's positive response to medication constituted a specific and legitimate reason

based on substantial evidence in the record.

### 4. The ALJ Properly Discounted Dr. Zink's Opinion as it Relied on Plaintiff's Credibility

In a footnote, the ALJ articulated a fourth reason for discounting Dr. Zink's opinion: because it appeared Dr. Zink "accepted just about everything" Plaintiff said, notwithstanding her lack of credibility. (Admin. R. at 28.)

If a claimant's credibility is properly discounted, an ALJ may reject a treating physician's opinion if it is significantly based on a claimant's self-reports. Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008). In analyzing credibility, an ALJ considers specific factors such as the claimant's reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, claimant's daily activities, and work record, and testimony of physicians and third parties. Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). Here, the ALJ expressed concern about Plaintiff's use of cannabis, commenting, "The credibility of an individual who breaks laws by using/abusing illegal substances is always suspect." (Admin. R. at 27.) He also observed the inconsistency between Plaintiff's hearing testimony about her marijuana use−that she had last used marijuana a month prior, but before that had not smoked marijuana for twenty years−and the contrary information in her medical records that she uses cannabis on a daily basis. (Id.) The ALJ also discussed Plaintiff's application for unemployment benefits, in which she stated she was able to work, and denied being too sick or injured to work, during her period of alleged disability. (Id.) Moreover, she testified that she had looked for work after her alleged onset date. (Id.) The ALJ found these facts to be contradictory and a negative indication of Plaintiff's credibility. (Id.)

Plaintiff does not dispute the ALJ properly discounted her credibility. The Court finds the ALJ had proper grounds to discount Dr. Zink's opinion on the grounds it relied heavily on Plaintiff's self-reports. See Tommasetti, 533 F.3d at

1  1041.

2  **B.   <u>Dr. Bagner</u>**

3       Plaintiff argues the ALJ erred in discounting Dr. Bagner's medical opinion

4  because he did not adequately explain how Dr. Bagner's opinion was

5  inconsistent with the record as a whole, and because he could not properly

6  discount Dr. Bagner's opinion simply because he was a non-treating source.

7  (Pl.'s Mot. at 18-19.)

8       As set forth above, Dr. Bagner assessed Plaintiff as mildly limited in

9  following simple oral and written instructions; moderately limited in following

10  detailed instructions, interacting with the public, coworkers, and supervisor,

11  complying with job rules, responding to changes in a routine work setting, and in

12  her daily activities; and severely limited in responding to work pressure in a usual

13  work setting. (Admin. R. at 490-91.) When rating the degree of functional

14  limitations, the SSA uses the following five-point scale: none, mild, moderate,

15  marked, and extreme. 20 C.F.R. §§ 404.1520a, 416.920a. Only functional

16  limitations of "marked" or higher are considered to be of sufficient degree of

17  limitation to satisfy the functional criterion equating to a severe impairment. <u>See</u>,

18  <u>e.g.</u>, 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 (requiring marked impairment-

19  related functional limitations to satisfy paragraph B criteria in mental disorder

20  listings). A "marked" degree of limitation exists when the impairment interferes

21  seriously with the ability to function independently, appropriately, effectively, and

22  on a sustained basis. <u>Id.</u> at § 12.00(C).

23       Dr. Bagner found Plaintiff had only one "severe" (i.e., "marked" or

24  "extreme") functional limitation: her ability to respond to work pressure in a usual

25  work setting. (Admin. R. at 491.) The rest of her functional limitations were mild

26  or moderate. (<u>Id.</u> at 490-91.) It is not at all clear, as Plaintiff presumes, that

27  crediting Dr. Bagner's opinion would lead to a finding of disability. Indeed, Dr.

28  Bagner found Plaintiff had a GAF score of 60, indicative of only moderate

symptoms and difficulties. See *supra* note 3. Additionally, it is important to note the ALJ did not discount the entirety of Dr. Bagner's opinion. Rather, he stated,

> Due consideration is given to the opinion of the consultative examiner, Dr. Bagner. Elements of the doctor's opinion appear too restrictive based on the record as a whole. The medical consultant examined the claimant on a one-time basis and had no treating relationship with the claimant, which renders his opinions less persuasive [citations omitted]. The doctor's opinion, to the degree that it is consistent with the objective medical evidence and consistent with the RFC [residual functional capacity] outlined in today's Decision, is reflected in the RFC.

(Admin. R. at 28.)

While Plaintiff is arguably correct that the ALJ failed to identify specific evidence contradicting Dr. Bagner's opinion, any such error was harmless. Plaintiff has failed to show that Dr. Bagner's opinion would affect the RFC formulated by the ALJ or that it would help Plaintiff establish disability, as Dr. Bagner did not find that Plaintiff was disabled. Rather, he found she had functional limitations, only one of which−her ability to respond to work pressure in a usual work setting−he deemed "severe." (Id. at 491.) The ALJ acknowledged and accounted for this and other limitations by restricting the type of work Plaintiff could perform to simple routine tasks, not in a fast-paced production environment, with only occasional interactions with supervisors and co-workers, and only brief, intermittent, and superficial public contact. (Id. at 24.)

Furthermore, as the ALJ noted by observing that Dr. Bagner saw Plaintiff on only one occasion, Dr. Bagner did not have a longitudinal picture of Plaintiff's impairments. Dr. Bagner evaluated Plaintiff in April 2012. According to the medical notes of Dr. Zink and Dr. Rahmani, Plaintiff's condition improved thereafter. (See id. at 584-97, 662-66.) Dr. Bagner's opinion, therefore, does not reflect an accurate depiction of Plaintiff's condition, giving the ALJ sufficient grounds to discount it. See 20 C.F.R. § 404.1527(c)(2)(i).

15cv1973 AJB(JMA)

The ALJ satisfied the substantial evidence requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." See Garrison, 759 F.3d at 1012 (quotations and citation omitted). The Court concludes, after a thorough review of the record as a whole, that there was substantial evidence supporting the ALJ's evaluation of the medical evidence, formulation of Plaintiff's RFC, and finding that Plaintiff is not disabled.

## VII.   CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED**.

Dated:  September 8, 2016

Hon. Anthony J. Battaglia
United States District Judge